HARNISCHFEGER CORPORATION *et al.*, Plaintiffs-Appellees, v. GLEASON CRANE RENTALS, INC., Defendant-Appellant.

Fifth District   No. 5—89—0717

Opinion filed December 30, 1991.—Rehearing denied January 31, 1992.

John L. McMullin and T. Michael Ward, both of Brown, James & Rabbitt, P.C., of Belleville and of St. Louis, Missouri, for appellant.

John W. Bell and William G. Beatty, both of Johnson & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellee Harnischfeger Corporation.

Russell K. Scott, of Dunham, Boman & Leskera, of Belleville, for appellee H.H. Hall Construction Company.

Karl D. Dexheimer and William J. Neihoff, both of Thompson & Mitchell, of Belleville, for appellee Union Electric Company.

JUSTICE CHAPMAN delivered the opinion of the court:

This appeal arises out of an action for contribution brought by Harnischfeger Corporation, H.H. Hall Construction Company, and Union Electric Company against Gleason Crane Rentals, Inc., for sums paid in settlement of the underlying claims of John and Cynthia Clark.

John Clark was severely injured when the crane he was operating for Keeley & Sons, Inc., contacted an energized power line. John and his wife Cynthia filed suit against Keeley Brothers Contracting Company, Keeley & Sons, Inc., Harnischfeger Corporation (Harnischfeger), H.H. Hall Construction Company (Hall), Union Electric Company (Union Electric), and Gleason Crane Rentals, Inc. (Gleason). Plaintiffs settled their claims against Keeley Brothers Contracting and Keeley & Sons, Inc. (Keeley defendants) for $1.8 million. The trial court determined that the settlement was made in good faith and dismissed the contribution actions against the Keeley defendants; they are not involved in this appeal.

The matter proceeded to trial on October 12, 1988. After opening statements were made, the Clarks announced that a settlement had been reached with Harnischfeger, Hall and Union Electric for the following sums:

| | |
|---|---|
| Harnischfeger Corporation | $1.7 million |
| H.H. Hall Construction Company | $2 million |
| Union Electric Company | $500,000. |

As part of the settlement, the Clarks' claims against Gleason were dismissed with prejudice. Harnischfeger, Hall and Union Electric, none of which had any claims against one another, then tried their contribution actions against Gleason. The allegations in the Hall, Harnischfeger and Union Electric pleadings may be summarized as follows:

(a) Harnischfeger designed and manufactured the crane and sold it to Gleason in April 1977.

(b) After the sale and while the crane was still owned by Gleason, Harnischfeger sent Gleason a quantity of decals, which advised of the dangers associated with operating cranes near power lines. These decals were to be placed on Harnischfeger cranes owned by Gleason.

(c) In April 1981, Gleason sold the crane to Metro Construction Equipment Company which, in turn, sold the crane to Keeley Brothers Contracting Company in October 1981.

(d) Gleason had a duty to act with reasonable care in the application of warning signs provided by Harnischfeger as well as

providing the purchaser with safety manuals provided by Harnischfeger.

(e) Gleason was negligent in failing to apply the warning decals supplied by Harnischfeger, in failing to furnish the crane at the time of its sale to Metro Construction Equipment Company (Metro) with the warning decals supplied by Harnischfeger, and in failing to supply the crane at the time of its sale to Metro with certain operator's manuals which warned operators of the dangers associated with overhead power lines.

(f) One or more of Gleason's negligent acts resulted in the Clarks' injuries and damages.

(g) In settling with the Clarks, Harnischfeger, Hall, and Union Electric paid in excess of their *pro rata* share of liability.

(h) Harnischfeger, Hall, and Union Electric have a right of contribution against Gleason for the amount of money paid to the Clarks in excess of their *pro rata* share of liability.

The case was tried to a jury which returned separate verdicts in favor of Harnischfeger, Hall, and Union Electric. Fault was assessed as follows:

| Harnischfeger Corporation | 50% |
| Gleason Crane Rentals, Inc. | 50% |
| H.H. Hall Construction Co. | 5% |
| Gleason Crane Rentals, Inc. | 95% |
| Union Electric Company | 10% |
| Gleason Crane Rentals, Inc. | 90% |

Based on these verdicts the trial court entered judgment in favor of Harnischfeger in the sum of $850,000, Hall in the sum of $1,900,000, and Union Electric in the sum of $450,000. Gleason's motion for new trial or judgment notwithstanding the verdict was denied. Gleason appeals. We affirm.

■■ Before addressing the merits of this case we note that defendant Hall suggests that because Gleason did not raise the issue of the legal sufficiency of the contribution allegations until its post-trial motion it has waived this argument. It is well settled that an appellant may not raise as grounds for reversal on appeal a defense not interposed before the trial court. (*Downes Swimming Pool, Inc. v. North Shore National Bank* (1984), 124 Ill. App. 3d 457, 464 N.E.2d 761; *Washington v. Civil Service Comm'n* (1983), 120 Ill. App. 3d 822, 458 N.E.2d 952; Ill. Rev. Stat. 1989, ch. 110, par. 2—613.) "The test of whether a defense is affirmative and must be pleaded by a defendant is whether the defense gives color to the opposing party's claim

and then asserts new matter by which the apparent right is defeated. The admission of the apparent right is inferable from the affirmative defense." (*Worner Agency, Inc. v. Doyle* (1984), 121 Ill. App. 3d 219, 222, 459 N.E.2d 633, 635.) Because the defense of no duty imposed by law attacks the legal sufficiency of the plaintiffs' claim and does not give color to the plaintiffs' claim, it does not constitute an affirmative defense. Gleason raised the defense of the legal sufficiency of the contribution claims in its post-trial motion. A defendant's failure to object to the complaint prior to filing a post-trial motion does not necessarily waive the question of whether the complaint fails to state a cause of action and is legally insufficient. (*Swager v. Couri* (1979), 77 Ill. 2d 173, 395 N.E.2d 921.) We conclude that Gleason did not waive the right to raise this issue on appeal.

The Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1989, ch. 70, par. 301 *et seq.*) focuses on the culpability of the parties. (*Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 14, 461 N.E.2d 382, 388.) The basis for a contributor's obligation depends on his liability in tort to the injured party. (*J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 462, 516 N.E.2d 260, 267.) In this case Harnischfeger, Hall, and Union Electric charged Gleason with negligence in failing to warn of the dangers of electricity by not applying the appropriate warning decals on the crane and/or by not supplying certain safety manuals.

The essential elements of a cause of action based on common law negligence are the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. (*Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 513 N.E.2d 387.) The question we are confronted with concerns the existence of a duty. Gleason argues that under Illinois law (see *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 343 N.E.2d 465) it had no duty to warn John Clark of the open and obvious dangers associated with electricity and overhead power lines and, therefore, cannot be subject to liability under the contribution claims of Harnischfeger, Hall and Union Electric.

In *Genaust,* the plaintiff was installing a galvanized steel tower and citizens band antenna, and the tower and antenna came into close proximity to uninsulated overhead power lines. Electric current arced from the power lines to the antenna and severely injured the plaintiff. Plaintiff filed a six-count complaint predicated upon negligence and strict liability in tort. The circuit court dismissed five counts of the plaintiff's complaint, thus forming the basis for the *Genaust* appeal. Count I of plaintiff's complaint, premised on negligence, was not dis-

missed by the circuit court and was not involved in the *Genaust* appeal. The supreme court held that there was no duty to warn of the dangers of electricity and affirmed the dismissal of those counts of plaintiff's complaint alleging such a duty. In the instant case, Gleason refers to the language of *Genaust*:

> "[T]he danger of electricity is common knowledge. Moreover, it is common knowledge that metal will conduct electricity. Accordingly, it is not objectively reasonable to expect that a person, knowing the danger of electricity if metal should contact electrical wires, would attempt to install a metal tower and antenna in such close proximity to electrical wires. \* \* \* [I]t was not reasonably foreseeable a user would install the products in such proximity to electrical wires when the harsh consequences of the slightest mishap, which would cause the metal to contact the wires, are so obvious." *Genaust*, 62 Ill. 2d at 466, 343 N.E.2d at 471.

We recognize that there is an obvious danger in operating a crane near overhead power lines. We are fully aware of *Genaust* and its progeny. (*Genaust*, 62 Ill. 2d 456, 343 N.E.2d 387; *Hansen v. Goodyear Tire & Rubber Co.* (1990), 194 Ill. App. 3d 351, 551 N.E.2d 253; *Watkins v. Mt. Carmel Public Utility Co.* (1988), 165 Ill. App. 3d 493, 519 N.E.2d 10; *Bonder v. Commonwealth Edison Co.* (1988), 168 Ill. App. 3d 80, 522 N.E.2d 227; *Icenogle v. Myers* (1988), 167 Ill. App. 3d 239, 521 N.E.2d 163; *Carroll v. Commonwealth Edison Co.* (1986), 147 Ill. App. 3d 909, 498 N.E.2d 645; *Fisher v. Crippen* (1986), 144 Ill. App. 3d 239, 493 N.E.2d 1204; *Holecek v. E-Z Just* (1984), 124 Ill. App. 3d 251, 464 N.E.2d 696; *Miscevich v. Commonwealth Edison Co.* (1982), 110 Ill. App. 3d 400, 442 N.E.2d 338; *Clarke v. Rural Electric Convenience Cooperative Co.* (1982), 110 Ill. App. 3d 259, 442 N.E.2d 278; *Stambaugh v. Central Illinois Light Co.* (1976), 42 Ill. App. 3d 582, 356 N.E.2d 148; *cf. In re Estate of Martin* (1990), 202 Ill. App. 3d 659, 559 N.E.2d 1125; *German v. Illinois Power Co.* (1983), 115 Ill. App. 3d 977, 451 N.E.2d 903.) We first note that only the products liability count was at issue in *Genaust*; the negligence count had not been dismissed by the trial court. In addition, we are also aware that most of the cases following *Genaust* simply reiterate that an open and obvious danger equals no recovery without any serious discussion of the rationale for the rule. (Notable exceptions to the trend are *Nelson v. Commonwealth Edison Co.* (1984), 124 Ill. App. 3d 655, 465 N.E.2d 513, and *Smith v. American Motors Sales Corp.* (1991), 215 Ill. App. 3d 951, 576 N.E.2d 146.) We are further aware that "[t]he patent danger rule has been roundly criticized by many commentators; its de-

mise was announced in 1974; and it has now been rejected by the court in which it originated." (Darling, *The Patent Danger Rule: An Analysis & A Survey of its Vitality*, 29 Mercer L. Rev. 583, 584 (1978), citing James, *Products Liability*, 34 Tex. L. Rev. 44, 51 (1955); 2 Harper & James, Law of Torts §28.5 (1956); Noel, *Manufacturer's Negligence of Design or Directions for Use of a Product*, 71 Yale L.J. 816, 836-41 (1962); Keeton, *Products Liability—Inadequacy of Information*, 48 Tex. L. Rev. 398, 400 (1970); Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 842-43 (1973); Marschall, *An Obvious Wrong Does Not Make a Right: Manufacturers' Liability for Patently Dangerous Products*, 48 N.Y.U.L. Rev. 1065 (1973); Twerski, *Old Wine in a New Flask—Restructuring Assumption of Risk in the Products Liability Era*, 60 Iowa L. Rev. 1, 14 (1974); Twerski, Weinstein, Donaher & Piehler, *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age*, 61 Cornell L. Rev. 495, 507-09 (1976); Harris, *Products Liability*, 1977 Ann. Survey of Am. L. 85, 87-92 (1977); Twerski, *From Defect to Cause to Comparative Fault—Rethinking Some Product Liability Concepts*, 60 Marq. L. Rev. 297, 307-10 (1977); Rheingold, *The Expanding Liability of the Product Supplier: A Primer*, 2 Hofstra L. Rev. 521, 541 (1974).) Most importantly we are aware that our supreme court has held that the obviousness of the danger does not necessarily justify the risk of harm. *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 554 N.E.2d 223:

"A duty limitation is proper for those dangers which are always outside the defendant's scope of duty, but obvious dangers are not always found there. The argument that the obviousness always takes the danger beyond the scope of defendant's duty does not address the simple fact that the same hole in the ground, perfectly obvious by day, is not obvious under cover of total darkness." (*Ward*, 136 Ill. 2d at 146, 554 N.E.2d at 229, citing *Hanson v. Town & Country Shopping Center, Inc.* (1966), 259 Iowa 542, 547, 144 N.W.2d 870, 874.)

One commentator has criticized the patent danger rule as follows:

"[T]he patent danger rule flies in the face of the calculus of risk analysis by insulating defendants with the *per se* position that obvious flaws are not actionable. Obviousness of danger, which should be but one factor in determining foreseeability and reasonableness of risk, becomes *the* factor in determining whether defendant's conduct is actionable. The position that a risk is automatically reasonable by virtue of being obvious is indefensible under ordinary negligence analysis." Darling, *Patent*

*Danger Rule: An Analysis & A Survey of its Vitality*, 29 Mercer L. Rev. 585, 588 (1978).

■ Because of the concern about the duty question and because Gleason's focus is on the absence of duty in this case, we will begin our examination with the more general question: what is a duty? A duty is a legally recognized obligation to do or to refrain from doing something. The key words in this definition are "legally recognized." We all have a moral obligation to act as good Samaritans—to come to the aid of travelers in distress; to act as good sons and daughters—to visit our parents regularly and often (dutiful children we believe is the phrase); and to act as protectors of Mother Earth—to turn off the tap while brushing our teeth. However laudable each of these activities may be, it is clear that none of them are legally recognized obligations; we are free to pass by stricken travelers, ignore our lonely parents, and run the bath water to the brim without any concern that the legislature or the courts will impose any penalty.

It is equally clear that the legislature and the courts are the primary sources of legally recognized duties. During a drought the legislature may pass a statute which limits the amount of water that can be used, and a court may conclude that the preferable procedure would be to stop and succor the bandit's victim. The source of the latter duty is involved in this case; what is a duty that is created by a court? The answer can be found in the question; a duty exists when a court says it exists. This response is not as facetious as it sounds:

> "The extent of duty can seldom, if ever, be determined until all the facts of a transaction in its environmental setting are known, and some appropriate rule of law is found available; here the wisdom of the wisest of our profession, the judges, is called into play. It is they and they only who can say whether the risk that has brought injury to the victim shall be borne by the defendant, if the other issues are found favorably to the plaintiff. This is the law-making or law-declaring function of the courts and its range extends far beyond the range of the reasonable man's foresight, or the foresight of anyone." (Green, *Foreseeability in Negligence Law*, 61 Colum. L. Rev. 1401, 1418 (1961).)

While this quote would seem to indicate that the judges' power to create duties is practically unbridled, we do not believe that to be an accurate construction of Professor Green's words. In another article he states:

> "Duty as a creative concept for extending the protection of law to the rapidly increasing toll of deaths and personal injuries re-

sulting from the risks imposed by machine and other enterprise activities of the 1800's was slow in emerging. At first it was explicitly employed as a restriction on a defendant's liability in the landowner cases.

\* \* \*

\*\*\* For a long period the duty concept was also restrictive of the liability of the manufacturers, contractors and suppliers of products. Nearly all the risks productive of injuries in all these cases were thrown upon the victims rather than upon those whose operations of enterprise created the risks.

A change in the attitude of the courts came very slowly, first by the expansion of the duties of railroads to their passengers, employees, highway travelers at crossings and even trespassers on their tracks, expansion of the duties of landowners to travelers on the highways and even infant trespassers on their premises; later by the expansion of the duties of those who employed contractors to perform dangerous undertakings; still later by expanding the duties of those who undertook to perform services generally, even gratuitously; and finally, on large scale at least, by expanding the duties of those who manufacture or supply machines and products of all types. Over the course of the last century, and particularly the last third of that century, the duties of enterprisers have been expanded to include most of the risks of enterprise, and if the facts of the particular case raise an issue of negligence, liability will usually be imposed favorably to the victim. As so clearly stated by Judge Cardozo, the source of these duties is found in the law." Green, *Duties, Risks, Causation Doctrines*, 62 Tex. L. Rev. 42, 59-61 (1962).

Professor Green has also set forth the policy bases which he feels are utilized by courts when they make their determination of whether a duty exists:

"In the part of this paper published in an earlier number of the REVIEW, I sought to develop the idea that legal 'duties' are determined by factors outside any legal theory which has yet crystallized. These factors were designated: (1) The administrative factor; (2) the moral or ethical factor; (3) the economic factor; (4) the prophylactic factor; (5) the justice factor." Green, *The Duty Problem in Negligence Cases: II*, 29 Colum. L. Rev. 255, 255 (1929).

Perhaps more generally recognized as bases for a duty in negligence cases are sections 291 through 293, Restatement (Second) of Torts (1965):

"§291. Unreasonableness; How Determined; Magnitude of Risk and Utility of Conduct

Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done."

"§292. Factors Considered in Determining Utility of Actor's Conduct

In determining what the law regards as the utility of the actor's conduct for the purpose of determining whether the actor is negligent, the following factors are important:

(a) the social value which the law attaches to the interest which is to be advanced or protected by the conduct;

(b) the extent of the chance that this interest will be advanced or protected by the particular course of conduct;

(c) the extent of the chance that such interest can be adequately advanced or protected by another and less dangerous course of conduct."

"§293. Factors Considered in Determining Magnitude of Risk

In determining the magnitude of the risk for the purpose of determining whether the actor is negligent, the following factors are important:

(a) the social value which the law attaches to the interests which are imperiled;

(b) the extent of the chance that the actor's conduct will cause an invasion of any interest of the other or of one of a class of which the other is a member;

(c) the extent of the harm likely to be caused to the interests imperiled;

(d) the number of persons whose interests are likely to be invaded if the risk takes effect in harm."

A more detailed list of policy bases can be found in Professor Wade's article, *On The Nature of Strict Tort Liability for Products*:

"(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance." (Wade, *On The Nature of Strict Tort Liability for Products*, 73 Miss. L.J. 825, 837-38 (1973).)

We realize that Professor Wade was discussing products liability in his article, but we also realize that: (1) in warning cases the defendant must have actual or constructive knowledge of the danger before a duty to warn arises (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194), which certainly sounds similar to a negligence standard, and (2) Professor Wade himself stated that, "There are thus innate similarities between the actions in negligence and in strict liability, and changing the terminology does not alter this." 73 Miss. L.J. at 837.

■ Finally, our supreme court has provided a list of factors to be considered in determining whether a duty exists:

"In *Mieher v. Brown* (1973), 54 Ill. 2d 539, 301 N.E.2d 307, this court observed that 'the concept of duty in negligence cases is very involved, complex and indeed nebulous.' (54 Ill. 2d at 545, 301 N.E.2d at 307.) Nonetheless, this court has identified certain factors which are relevant to the existence of a duty. The 'reasonable foreseeability' of injury is one important concern (*Cunis v. Brennan* (1974), 56 Ill. 2d 372, 308 N.E.2d 617), but this court has recognized that foreseeability alone provides an inadequate foundation upon which to base the existence of a legal duty (*Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 525, 513 N.E.2d 387; *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 375, 308 N.E.2d 617; see also Green, *Foreseeability in Negligence Law*, 61 Colum. L. Rev. 1401, 1417-18 (1961)). Other considerations include the likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the

defendant. *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 526, 513 N.E.2d 387; *Lance v. Senior* (1967), 36 Ill. 2d 516, 518, 224 N.E.2d 231." *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140-41, 554 N.E.2d 223, 226-27.

With all these policies in mind we return again to Professor Green, who stated:

> "The judicial process in negligence cases is the experimental machinery of government-by-judges through which a restless and changing industrial society is furnished protection against its self-inflicted physical hurts. Only a few of the implications of such a conclusion can be stated here." Green, *The Duty Problem in Negligence Cases: II*, 29 Colum. L. Rev. 255, 279 (1929).

The question posed to this court is, "Does the open-and-obvious-danger rule preclude the imposition of a duty under the circumstances of this case?" We hold that the answer must be no.

■■ The open-and-obvious-danger rule in product liability cases focuses on the consumer-expectation test of liability: *i.e.*, did the product perform as a consumer would reasonably expect it to? In a warning case this test translates to: would a consumer reasonably expect to be warned about that danger? The reasonable-expectation test is actually only one facet of the duty analysis, and it deals only with the question of foreseeability. Further, the reasonable-expectation test is not the only test of liability in Illinois in products cases (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401); we also have the danger/utility or risk/benefit test. *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859; see also *Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 385 N.E.2d 690; *Derrick v. Yoder Co.* (1980), 88 Ill. App. 3d 864, 410 N.E.2d 1030.

■■ The risk/benefit or danger/utility test encompasses several of the same factors referred to in Professor Wade's article and in *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 554 N.E.2d 223, and obviously encompasses many more considerations than the relatively simple consumer-expectation test. To the extent that a court weighs one or more of the policy bases more heavily than the others, it may or may not recognize a duty. For example, if a court stresses Professor Wade's factor number seven, the feasibility of spreading the loss, the plaintiff, in general, may be favored, while in a court that more heavily weighs Professor Wade's factor number five, a user's ability to avoid danger in the use of the product, the defendant is more likely to prevail. When we turn from products liability cases to a negligence setting, we see similar policy considerations behind the recognition of a

duty and a greater or less likelihood of a duty being imposed depending upon which factors are more heavily weighted.

Which of the factors does the obvious-and-open-danger rule focus upon? Foreseeability only, although foreseeability is only one of the elements to be considered. (*Ward*, 136 Ill. 2d 132, 554 N.E.2d 223.) Furthermore, and herein lies the greatest problem, the rule focuses upon foreseeability from the viewpoint of the plaintiff. The importance of the point of view used in the analysis cannot be overemphasized. A comment about Socrates, who believed in only one God as opposed to the majority of Greeks at the time who believed in a multitude of deities, is illustrative. "That is the atheist who says there is only one God." (W. Durant, *The Story of Philosphy* 7 (1961), citing Voltaire, *Philosophical Dictionary*, art. "Socrates.") The fact that courts are viewing open and obvious dangers through plaintiffs' eyes becomes clear when we realize that in adopting it as a duty-denial tool they are in essence saying, "The more obvious the danger, the less the duty to warn." If the duty issue is viewed from the defendant's standpoint, such a rule makes no sense at all. Juries would forgive a defendant's failure to warn if the defendant knew nothing of the hazard. Indeed, our supreme court has held that there is no duty to warn in products cases unless there is knowledge of the danger. (*Woodill*, 79 Ill. 2d 26, 402 N.E.2d 194.) Does it not follow then that, all other things being equal, the greater the degree of knowledge of the danger the greater the duty to warn? We believe that it does.

We further believe that the confusion in the open-and-obvious-danger cases has arisen *because* the degree of the awareness of danger has been viewed from the plaintiff's standpoint rather than the defendant's. If a danger is truly glaring, the courts could have used the open-and-obvious-danger rule to prevent recovery because of the plaintiff's conduct in encountering it, *i.e.*, an assumption-of-the-risk defense. Such a result might be justified depending upon the factual circumstances of the case, but if that is to be the result, the reason for it should be clearly stated rather than relying upon "no duty to warn because the danger is open and obvious."

Another possible reason for the utilization of the open-and-obvious-danger rule is that some courts have skipped steps in their analysis; they have gone from the question of whether a defendant should furnish a warning to the question of upon whom it is more efficient to place the burden of preventing the injury. In other words some courts may have focused not on the foreseeability issue only but may have instead focused on a combination of Professor Wade's factors four, five and six (73 Miss. L.J. 825, 837-38).

If they have done either of these, however, they have certainly done it without any discussion of such rationales. Our disagreement with those cases stems not necessarily from their results but with the reasoning employed to reach the results. To illustrate our discussion, we submit that the often-cited example of no duty to place a warning on a sharp knife because it is an open and obvious danger is actually based on either or both of the just stated but different tests. The first of these is that there is no duty under the consumer-expectation test because the danger of cutting oneself with a sharp knife is so well known that no consumer would expect to be warned of it. The second is that, under the risk/benefit test, the magnitude of the risk is so small and the utility of the warning so negligible that no duty to warn will be imposed. Again, while the answer to this question of duty may furnish an identical result, *i.e.*, no recovery by the injured person, it is important for courts to realize the true basis for their decisions because different results *may* occur depending upon the facts of the case.

Defendant contends there should be no duty to warn if the plaintiff is equally aware of the dangers. However, warnings are not a useless act even though plaintiffs may have some awareness of the danger. All of us are aware of the wisdom of wearing seatbelts, but that general awareness does not negate the effectiveness of reminders in multiple form: visual—lights on the dash; auditory—bells; informative—"Buckle up for safety"; and even criminal—section 12—603.1(d) of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 12—603.1(d)). We note that the legislature has made a judgment as to the plaintiff's duty to wear a seat belt by providing that the failure to do so cannot be considered either as evidence of contributory negligence or in diminution of damages. Ill. Rev. Stat. 1989, ch. 95½, par. 12—603.1(c).

Another example of what might appear to be unnecessary warnings are the backup systems on airplanes. The first safety system, of course, is the pilot's vision, but to give only one example of a backup to that: all commercial aircraft are equipped with barometric altimeters which furnish the pilot with the plane's distance above ground by means of an instrument. It might be thought that the altimeter is a necessity rather than a backup feature since commercial airlines typically fly at night and in inclement weather. This is, of course, true, but the altimeter is also available to the pilot during daytime and clear-weather flying conditions so that the aircraft can properly maintain assigned altitudes. Moreover, in addition to the altimeter, all airplanes that operate within terminal control areas are required to be

equipped with a transponder with automatic altitude-reporting equipment so that the air traffic controller on the ground can observe his radarscope and advise the pilot of any deviation in his assigned altitude. (14 C.F.R. Pt. 91, App. A (1991).) There are other indications from an airplane's operations that would furnish information to a skilled pilot about the plane's altitude, but the two mentioned are primarily safety features and both are furnished even though every pilot knows that a plane should not be flown too close to the ground.

What do these examples mean? Are they to be interpreted so as to establish a principle of law which requires the attachment of warning after warning until the product looks like a Winston Cup or an Indianapolis race car that has oversold endorsement space, or do they mean that, regardless of the hazard, an adequate warning will insulate the defendant from liability? The answer to the second question must be no, and the answer to the third question can be found in Dean Prosser's imaginative hypothetical:

> "If somebody sells a biscuit full of potassium cyanide, I don't think any court in the country has ever held or ever will hold that he can escape by putting on the box, 'Don't eat these.' "
> (Prosser, 38 *American Law Institute Proceedings* 68 (1961).)

The answer to the first question is the most difficult. What sort of duty, if any, should the court impose under the circumstances of this case? Or what lessons have been learned from this review?

■■■ The first lesson to be learned is that the obviousness of the danger is only *one* of the features that should be considered in determining whether a duty exists: foreseeability alone provides an inadequate foundation upon which to base the existence of a legal duty. *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 525, 513 N.E.2d 387, 396.

The second lesson is that warnings serve two purposes: to inform us of dangers of which we are unaware, and to remind us of hazards of which we are already aware but may, due to distraction, momentarily forget. (See *Deibert v. Bauer Brothers Construction Co.* (1990), 141 Ill. 2d 430, 566 N.E.2d 239; see Bailey, *Human Performance Engineering: A Guide for System Designers* 237 (1982).) As products become more complex, as the setting in which they are used becomes more distracting, as the magnitude of the possible injury increases, the calculus of risks/benefits may change. To conclude our discussion on the policy aspect of imposing a duty in this case, we reiterate that the obviousness of the danger is only *one* of the factors that should be considered in determining whether a duty exists.

Third, we should be aware that warnings are, at best, the least-favored method of protection in dealing with a hazard. We note that accident-prevention analysis from an engineer's standpoint proceeds as follows: first, eliminate the hazard; second, if there is no feasible way to eliminate the hazard, guard against it; and finally, and only as a last resort, if it is impossible to eliminate or guard against it, warn about it. (See Bailey, *Human Performance Engineering: A Guide For System Designers* 11 (1982).) Therefore, when we encounter the question of a duty to warn, we are already in a situation dealing not even with second best, but of third best.

■ In this case the crane supplier was aware that cranes are used in close proximity to power lines and the high probability of serious injury or death in the event of contact with the lines. Further, it is common knowledge that distractions in the form of workmen, other equipment, and other elements will be present on jobsites and that employers may require certain jobs to be done in ways, under conditions and within times that may not be conducive to the safest operations. In the present case it is objectively reasonable to expect that the defendant was aware that the operators of its cranes would be using the machinery in the performance of tasks over which they have no choice but to maneuver in close proximity to overhead power lines. The requirement of applying the decals in this case would serve not only to inform the user or operator but to continually remind him to check for power lines.

It has already been mentioned that the likelihood of injury where a crane comes into contact with an overhead power line is great. The burden on the defendant of warning against this danger is slight. Defendant had been furnished with the warning decals and had only to apply the warnings to the crane. We hold that it had a duty to do so.

■ Gleason next argues that Harnischfeger, Hall and Union Electric failed to make a submissible case for contribution against Gleason because they were not subject to liability for the injuries and damages of the plaintiffs and, therefore, were not culpable parties within the meaning of the Contribution Act. In view of our decision as to the duty issue as to Gleason, it is unnecessary for us to further discuss this point.

The next issue for our review is whether the trial court erred in submitting multiple verdict forms to the jury. Harnischfeger, Hall, and Union Electric (hereinafter referred to as plaintiffs) contend that the submitted verdict forms are modified versions of Illinois Pattern Jury Instructions, Civil, No. 600.16 (2d ed. Supp. 1986). The submitted verdict forms provide:

"As between Harnischfeger Corporation and Gleason Crane Rentals, Inc., we, the jury, apportion damages as follows:

| | |
|---|---|
| Harnischfeger Corporation | _____% |
| Gleason Crane Rentals, Inc. | _____% |
| TOTAL | 100%" |

"As between H.H. Hall Construction Company and Gleason Crane Rentals, Inc., we, the jury, apportion damages as follows:

| | |
|---|---|
| H.H. Hall Construction Company | _____% |
| Gleason Crane Rentals, Inc. | _____% |
| TOTAL | 100%" |

"As between Union Electric Company and Gleason Crane Rentals, Inc., we, the jury, apportion damages as follows:

| | |
|---|---|
| Union Electric Company | _____% |
| Gleason Crane Rentals, Inc. | _____% |
| TOTAL | 100%" |

Gleason objected to the court's submission of three separate verdict forms. The court overruled the objection and refused Gleason's tendered instruction which follows Illinois Pattern Jury Instructions, Civil, No. 600.16 (2d ed. Supp. 1986):
"We, the jury, apportion damages as follows:

| | |
|---|---|
| Harnischfeger Corporation | _____% |
| H.H. Hall Construction Company | _____% |
| Union Electric Company | _____% |
| Gleason Crane Rentals, Inc. | _____% |
| TOTAL | 100%" |

The plaintiffs contend that because there were no cross-actions for contribution among them, there was no need to assign percentages of fault among them. They argue that it would have been inappropriate to submit a verdict form that would compare the culpability of the plaintiffs. Gleason responds that the multiple verdict forms gave rise to inconsistent verdicts. Fault was assessed as follows:

| | |
|---|---|
| Harnischfeger Corporation | 50% |
| Gleason Crane Rentals, Inc. | 50% |
| H.H. Hall Construction Co. | 5% |
| Gleason Crane Rentals, Inc. | 95% |
| Union Electric Company | 10% |
| Gleason Crane Rentals, Inc. | 90% |

■ Cross-claims for contribution among the contribution plaintiffs (Harnischfeger, Hall and Union Electric) had been extinguished. A

single verdict form would have required that the liability of the contribution plaintiffs be compared even though no claims existed among them. Although the record is unclear on this point, it is likely that the settling defendants had considered and rejected the possibility of maintaining their contribution claims against one another. By eliminating those claims they also eliminated the risk that their payment could exceed what they had already contributed toward settlement of the case. The multiple verdict form selected by the trial court reflected this choice. Gleason's claim that the single verdict form would have reduced its obligation is simply unsupported. As long as Gleason's obligation was assessed at 76.1% of the total culpability, its dollar obligation would have been the same. Gleason has failed to demonstrate how the use of a single verdict form would have effectuated any change.

Gleason argues that because multiple verdict forms were used the common liability totaled 300% thereby subjecting Gleason to an amount exceeding any amount Gleason would have been required to pay had the combined verdict form been used. We find no merit to this argument as it is easily discernible that as a result of the jury's determination Gleason is liable for 76.1% of the total liability.

| | |
|---|---|
| Gleason responsible for 50% of Harnischfeger's liability, or | $850,000. |
| Gleason responsible for 95% of Hall's liability, or | $1,900,000. |
| Gleason responsible for 90% of Union's liability, or | $450,000. |

| | |
|---|---|
| Total settlement: | $4,200,000 |
| Gleason's share: | $3,200,000, which represents 76.1% of the total settlement. |

It is clear that even though multiple verdict forms were used Gleason's liability did not exceed 100% as it would have us believe. In the instant case, because each of the contribution plaintiffs had settled with the plaintiff in the underlying action and because there were no cross-claims among them, the separate verdict forms were proper.

Gleason next argues that the trial court erred in submitting modified versions of Illinois Pattern Jury Instructions, Civil (hereinafter IPI), Nos. 600.09, 600.10 to the jury. (Illinois Pattern Jury Instructions, Civil, Nos. 600.09, 600.10 (2d ed. 1986 Supp.).) Each of these IPI instructions is set forth below in its entirety. The underlined por-

tions were not included in the instructions given by the court. Gleason argues that the *underlined* language was wrongfully omitted from the instructions which were submitted to the jury.

"Harnischfeger Corporation, H.H. Hall Construction Company and Union Electric Company each have paid sums of money to John Clark and Cynthia Clark in settlement of John and Cynthia Clark's claims for their injuries and damages. Harnischfeger Corporation, H.H. Hall Construction Company and Union Electric Company each now claim that they are entitled to contribution from Gleason Crane Rentals, Inc. for a percentage of those sums paid.

*Harnischfeger Corporation, H.H. Hall Construction Company, and Union Electric Company further claim that the payments were made in reasonable anticipation of their liability to John and Cynthia Clark.*

Harnischfeger Corporation, H.H. Hall Construction Company and Union Electric Company each claim that Gleason Crane Rentals, Inc. was negligent in one or more of the following respects:

(a) in failing to apply warning decals on the cranes concerning the hazards associated with power lines, as it was instructed to do by Harnischfeger Corporation;

(b) in failing to provide with the subject crane at the time of its sale by Gleason to Metro Construction Equipment Company the warning decals concerning the hazards associated with cranes coming into contact with overhead power lines, said decals having been previously supplied to Gleason by Harnischfeger Corporation;

(c) in failing to provide with the crane at the time of its sale by Gleason to Metro Construction Equipment Company certain safety manuals which contained warnings to the users of the crane concerning the hazards associated with overhead power lines.

Harnischfeger Corporation, H.H. Hall Construction Company and Union Electric Company each further claim that one or more of the foregoing was a proximate cause of John and Cynthia Clark's injuries and damages.

Gleason Crane Rentals, Inc. denies that it did any of the things claimed by Harnischfeger Corporation, H.H. Hall Construction Company and Union Electric Company, and denies that any claimed act or omission on the part of Gleason Crane

Rentals, Inc. was a proximate cause of John and Cynthia Clark's injuries and damages."

"The plaintiffs, Harnischfeger Corporation, H.H. Hall Construction Company and Union Electric Company each have the burden of proving each of the following propositions:

First, that Gleason Crane Rentals, Inc. acted or failed to act in one of the ways claimed in these instructions, and that in so acting, or failing to act, Gleason Crane Rentals, Inc. was negligent;

Second, that the negligence of Gleason Crane Rentals, Inc. was a proximate cause of the injury to John Clark.

*Third, that the payments Harnischfeger Corporation, H.H. Hall Construction Company and Union Electric Company made were in reasonable anticipation of liability to John and Cynthia Clark.*

As to each of the plaintiffs in this case, if you find from your consideration of all of the evidence that each of the propositions required of the plaintiffs have been proved, then your verdict should be for such plaintiffs, and you should apportion damages.

If, on the other hand, you find from your consideration of all of the evidence that any of the propositions required of Harnischfeger Corporation, H.H. Hall Construction Company or Union Electric Company has not been proved then, as to that plaintiff, your verdict should be for Gleason Crane Rentals, Inc. and against that plaintiff."

Gleason argues that a cause of action for contribution requires proof that the party paid more than its *pro rata* share of the "common liability" (Ill. Rev. Stat. 1989, ch. 70, par. 302(b)), and that proof of liability to the injured party is necessary to sustain a cause of action for contribution. Therefore, according to Gleason, the above instructions did not accurately state the law and their submission was reversible error.

■■ The test in determining the propriety of submitted jury instructions is whether, taken as a whole, they are sufficiently clear so as not to mislead the jury and whether they fairly and accurately state the law. (*Schuchman v. Stackable* (1990), 198 Ill. App. 3d 209, 225, 555 N.E.2d 1012, 1022.) Gleason has not demonstrated how the omission of the bracketed material prejudiced it. In light of the above, we find no error in the trial court's omission of the language in this case.

Gleason also argues that the trial court erred in omitting the last line of IPI 600.10, which reads:

"and you will have no occasion to consider the apportionment of damages."

Gleason contends that the last line should not have been omitted, and that Gleason's tendered instruction No. 1 should have been given:

"If you decide for Gleason Crane Rentals, Inc. on the question of its liability to John Clark and Cynthia Clark, you will have no occasion to consider the question of damages to the plaintiffs in this contribution suit."

The jury was instructed to complete the multiple verdict forms which apportion damages between Gleason and each of the three plaintiffs. The jury was advised that it must fill in a percentage for each party and that if it found in favor of the defendant, it must fill in zero percent (0%) for Gleason. The court further instructed the jury that on each of the three verdict forms the total of the percentages must equal 100%.

Gleason's argument that the instructions given directed the jury to apportion fault without first determining the right to contribution is unfounded. The jury was told that it could find that Gleason was not liable for contribution. In the event it made such a finding, it was directed to complete the apportionment form, filling in "0%." The omitted language of IPI No. 600.10 and Gleason's tendered instruction could have confused the jury about what its obligation was with respect to completing the verdict forms. Gleason's instruction would have directed the jury that if it found in favor of Gleason it would have *no occasion to consider* the question of damages. This directly conflicts with the instructions which were given, requiring the jury to apportion damages to equal 100%.

Whenever available, the IPI instruction should be given, unless the court determines that it does not accurately state the law. (*Galowich v. Beech Aircraft Corp.* (1991), 209 Ill. App. 3d 128, 137, 568 N.E.2d 46, 52; 134 Ill. 2d R. 239.) "It is, however, within the trial court's discretion to determine the form for jury instructions, and the test of proper instructions is whether they formulate a clear and adequate picture of the applicable law when viewed in their entirety." (*Galowich*, 209 Ill. App. 3d at 137, 568 N.E.2d at 52.) In the instant case, we find that the trial court did not err in ruling on the proposed instructions.

▪ The final issue for our review is whether the trial court erred in allowing Union Electric's motion *in limine* and prohibiting Gleason from presenting evidence to show that the power lines in

question did not have any vision enhancement or other warning devices. Union Electric argues that because Gleason did not raise as error in its post-trial motion any claims regarding warning signs or power-line height such claims are waived. (134 Ill. 2d R. 366(b)(2)(iii); *Lewis v. Beckman* (1978), 57 Ill. App. 3d 482, 373 N.E.2d 589.) We find that Gleason did not waive his claims of error regarding vision-enhancement devices, warning signs or line height as its post-trial motion clearly states that "the court erred in granting Union Electric's Motion in Limine *** Union Electric's Motion in Limine should have been denied." Gleason's post-trial motion addresses in particular the alleged error in precluding testimony regarding vision-enhancement devices. The alleged error regarding power-line height and other warning signs is not addressed *per se*, but the post-trial motion clearly sets forth the alleged error in allowing Union's motion *in limine*.

The trial court excluded testimony regarding vision-enhancement and warning devices on the basis that no such evidence could be presented without expert testimony. Gleason made an offer of proof at trial via the testimony of William Habermehl, the crane operator. Habermehl testified that following John Clark's accident he examined the area around the power lines. He did not see any signs on the bridge structure or the utility poles, nor did he observe anything on the power lines which would have improved their visibility.

Union Electric argues that the court's decision was correct because Gleason did not establish that the practice of using such devices was customary or common in the industry or community. Union Electric maintains that Gleason presented no evidence in support of any duty to place vision-enhancement devices such as orange balls on the power lines. Furthermore, Gleason was not prepared to present any testimony as to the cost of the orange balls, how they would be attached to the electrical lines, or whether they could even be placed on high-voltage power lines. Union Electric contends that in this case expert testimony was required in order to present evidence regarding vision-enhancement devices, warning signs on the utility poles, and power-line relocation.

Union Electric points out that the custom of the industry is relevant and admissible to show community standards of reasonable conduct. (*Mazanek v. Rockford Drop Forge Co.* (1981), 98 Ill. App. 3d 956, 424 N.E.2d 1271, citing W. Prosser, Torts §33 (4th ed. 1971).) The issue, however, is whether or not the testimony Gleason desired to present is a matter of common knowledge. While Gleason's offer of proof demonstrates that its witness could have easily testified about

the absence of vision-enhancement or other warning devices, no foundation was laid to show that vision-enhancement devices or other warning devices were customary in the industry, were feasible or were even practical given the nature of high-voltage power lines. "In a tort case, custom and usage is a fact to be proved as any other fact and it may be the subject of expert testimony." (*McClure v. Suter* (1978), 63 Ill. App. 3d 378, 384, 379 N.E.2d 1376, 1381.) In this case, Gleason's offer of proof was simply to show that vision-enhancement and warning devices were nonexistent on the power line in question. In the context of this case, we cannot say that the trial court abused its discretion in sustaining Union Electric's motion *in limine*.

We affirm the judgment of the circuit court of St. Clair County.

Affirmed.

RARICK and WELCH, JJ., concur.