MARY GABRIEL, Plaintiff-Appellee, v. THE CITY OF EDWARDSVILLE, Defendant-Appellant.

Fifth District   No. 5—91—0402

Opinion filed December 4, 1992.

CHAPMAN, J., dissenting.

Robert W. Wilson and Alexander M. Wilson, both of Evans & Dixon, of Edwardsville, for appellant.

Sharon A. Knapp, of Carr, Korein, Kunin, Tillery, Montroy, Glass & Bogard, of Belleville, for appellee.

JUSTICE H. LEWIS delivered the opinion of the court:

Plaintiff, Mary Gabriel, brought this action against defendant, City of Edwardsville, to recover injuries she sustained when she walked into the street about five or six steps and tripped over a water main cover while on her way to her son's house. Plaintiff was not walking within a crosswalk when she fell. Plaintiff contends that defendant had a duty to maintain the street and that its failure to repair the raised water main cover created a dangerous condition. On August 29, 1990, the defendant moved for summary judgment. One of defendant's alleged grounds for summary judgment was that a municipality owes no duty to pedestrians crossing the street outside of the crosswalk. The circuit court denied the defendant's motion for summary judgment. Subsequently, at the close of the plaintiff's case, the defendant moved for a directed verdict, alleging that the plaintiff had failed to show that the City of Edwardsville breached a duty of care. The circuit court denied the defendant's motion. Two days later, at the close of all of the evidence, the defendant renewed its motion for a directed verdict. Once again the circuit court denied the defendant's motion. On April 11, 1991, the jury returned a verdict in favor of the plaintiff for $14,361.14, and judgment was entered accordingly. The defendant filed a post-trial motion on May 3, 1991. On May 17, 1991, the circuit court denied the defendant's post-trial motion.

Defendant appeals, claiming that the City of Edwardsville had no duty to safeguard the plaintiff, a pedestrian, who was using the street as a walkway and was not within the crosswalk.

Plaintiff counters with the argument that a duty existed because she was an intended and permitted user of the street. Because the sidewalk ended on the side of the street in which she was walking, she argues she was required to walk across the street. This argument is based upon section 3—102(a) of the Local Governmental and Governmental Employees Tort Immunity Act, which states as follows:

"Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity *intended and permitted to use the property* in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in sufficient time prior to an injury to have taken measures to remedy or protect against such condition." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 85, par. 3—102(a).)

Thus, for a pedestrian to be protected by this statute, he must be a permitted and intended user of the property under control of the city. (*Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 422, 592 N.E.2d 1098, 1101.) Further, to establish a cause of action for negligence, the plaintiff must show that the defendant owed a duty of care, the defendant breached the duty, and an injury was proximately caused by the breach. (*Wojdyla*, 148 Ill. 2d at 421, 592 N.E.2d at 1100.) We agree with the defendant that no duty existed; therefore, we reverse.

Defendant has cited several cases in support of its view that the plaintiff was not an intended and permitted user of the street. The case which is most analogous to the case at bar is *Greene v. City of Chicago* (1991), 209 Ill. App. 3d 311, 567 N.E.2d 1357. In *Greene*, the plaintiff, a pedestrian, fell into a pothole in the street while on his way to a friend's house. The plaintiff was not walking within a crosswalk when he fell. The circuit court granted summary judgment for the defendant and stated that the streets are made for automobiles, not for pedestrians, except at intersections where there are marked or unmarked crosswalks. The appellate court agreed with the circuit court and held that a municipality owes no duty to warn pedestrians of any hazards outside of the crosswalk when a pedestrian is not using the crosswalk. (*Greene*, 209 Ill. App. 3d at 313, 567 N.E.2d at 1358.) Several other cases have held likewise. (*Curatola v. Village of Niles* (1992), 230 Ill. App. 3d 743, 746, 598 N.E.2d 945, 946; *Vlahos v. City of Chicago* (1990), 198 Ill. App. 3d 911, 913, 556 N.E.2d 660, 661; *Mason v. City of Chicago* (1988), 173 Ill. App. 3d 330, 331, 527 N.E.2d 572, 573; *Risner v. City of Chicago* (1986), 150 Ill. App. 3d 827, 831, 502 N.E.2d 357, 360.) When pedestrians use the public streets as walkways, the law imposes no general duty upon a municipality to safeguard pedestrians. (*Greene*, 209 Ill. App. 3d at 313, 567 N.E.2d at 1358; *Vlahos*, 198 Ill. App. 3d at 913, 556 N.E.2d at 661; *Mason*, 173 Ill. App. 3d at 332, 527 N.E.2d at 573; *Deren v. City of Carbondale* (1973), 13 Ill. App. 3d 473, 478, 300 N.E.2d 590, 593.) To

impose such a duty on a municipality would overextend its function. (*Curatola*, 230 Ill. App. 3d at 745, 598 N.E.2d at 946; *Greene*, 209 Ill. App. 3d at 313, 567 N.E.2d at 1358; *Mason*, 173 Ill. App. 3d at 332, 527 N.E.2d at 573; *Deren*, 13 Ill. App. 3d at 478, 300 N.E.2d at 593.) Hence, the law is clear that a municipality owes no duty to a pedestrian crossing a public street outside of the crosswalk. *Greene*, 209 Ill. App. 3d at 313, 567 N.E.2d at 1358; *Vlahos*, 198 Ill. App. 3d at 913, 556 N.E.2d at 661; *Mason*, 173 Ill. App. 3d at 332, 527 N.E.2d at 573; *Deren*, 13 Ill. App. 3d at 478, 300 N.E.2d at 593.

■ The street is to be used for vehicular traffic, not pedestrians (*Risner*, 150 Ill. App. 3d at 831, 502 N.E.2d at 359), and it is reasonable that a municipality would foresee that only vehicular traffic would use the street (*Curatola*, 230 Ill. App. 3d at 746, 598 N.E.2d at 947; *Mason*, 173 Ill. App. 3d at 332, 527 N.E.2d at 573), while pedestrians would use the crosswalk to cross to the other side of a street (*Mason*, 173 Ill. App. 3d at 332, 527 N.E.2d at 573). Even when a street is continuously used by pedestrians, we find no Illinois authority which permits the conversion of the street into a sidewalk. (*Deren*, 13 Ill. App. 3d at 477, 300 N.E.2d at 593.) Further, a municipality has no duty to install sidewalks; therefore, it is unreasonable to require a municipality to continue an existing sidewalk. (*Frakes v. Martin* (1987), 151 Ill. App. 3d 676, 678, 503 N.E.2d 556, 558; *Best v. Richert* (1979), 72 Ill. App. 3d 371, 374, 389 N.E.2d 894, 896.) Thus, the plaintiff was not an "intended" user of the street because the streets are designated for use by vehicular traffic—not pedestrians. (*Ramirez v. City of Chicago* (1991), 212 Ill. App. 3d 751, 753, 571 N.E.2d 822, 826.) Therefore, we need not determine whether the plaintiff was a "permitted" user of the street because to prove that the City owed a duty, the plaintiff must show that she was both an "intended" *and* a "permitted" user of the street. *Ramirez*, 212 Ill. App. 3d at 753, 571 N.E.2d at 826.

Plaintiff cites *Di Domenico v. Village of Romeoville* (1988), 171 Ill. App. 3d 293, 525 N.E.2d 242, for the proposition that municipalities have a duty to pedestrians in areas other than crosswalks. In *Di Domenico* (171 Ill. App. 3d at 294, 525 N.E.2d at 243), the plaintiff was injured when he fell into a hole while walking on the street to obtain some items from the trunk of his legally parked vehicle. The *Di Domenico* court concluded that since the city permitted curbside parking on the street where the plaintiff fell into the hole, the city must have realized that pedestrians would be walking on that portion of the street as a means of ingress and egress to and from their vehicles. (*Di Domenico*, 171 Ill. App. 3d at 295, 525 N.E.2d at 243.) The instant case, however, does not present a similar factual situation. Therefore, we con-

clude that the city has no duty to a pedestrian such as the plaintiff who walked into the street about five to six steps and tripped over a water main cover. The plaintiff in the present case was not en route to or from her motor vehicle but was crossing the street outside the crosswalk to go to her son's house; thus, *Di Domenico* is distinguishable.

Further, our supreme court recently reiterated the well-established principles that the streets are for the use of moving automobiles and no duty attaches when pedestrians cross the street outside of a crosswalk. (*Wojdyla*, 148 Ill. 2d at 425, 592 N.E.2d at 1102.) In fact, the Wojdyla court stated as follows:

> "The roads are paved, marked and regulated by traffic signs and signals for the benefit of automobiles. Parking lanes are set out according to painted blocks on the pavement, signs or meters on the sidewalk or parkway, or painted markings on the curb. Pedestrian walkways are designated by painted crosswalks by design, and by intersections by custom. These are the indications of intended use. That pedestrians may be permitted to cross the street mid-block does not mean they should have unfettered access to cross the street at whatever time and under whatever circumstances they should so choose. Marked or unmarked crosswalks are intended for the protection of pedestrians crossing streets, and municipalities are charged with liability for those areas. Those areas do not, however, include a highway in mid-block." *Wojdyla*, 148 Ill. 2d at 426, 592 N.E.2d at 1102-03.

Accordingly, we have determined that the plaintiff was not an intended user of the street; therefore, the City of Edwardsville did not owe her a duty. Hence, we refuse to impose such a duty and believe that the defendant's motion for directed verdict should have been granted.

For the foregoing reasons, the judgment of the circuit court is reversed.

Reversed.

RARICK, J., concurs.

JUSTICE CHAPMAN, dissenting:

> "The path down the river was beaten out little more than a deer path but you could tell the way it ran that no wild beasts made this. No, these were human feet. They knew where they were going. A foot path was a pleasing road to travel on, for it came to all things in the woods in time, the rotten log worn through in the middle to let you by, the bed of moss that had

brown spots from feet, the sandy runs and cold spring, the narrows where the path clung to the sidehill, the hickory flats, the buck laurel and big whortleberry bushes in the swamp—the path got to all of them in time." C. Richter, The Trees, at 69.

" 'Lawsey me!' Sayward said. 'If Tateville's entitled to the court house, let them have it.'

It didn't bother her any. Everybody knew Tateville was bigger than Moonshine Church. It was richer, too, they said, with ditches dug on both sides of its main street, and sidewalks laid in brick or stone and no team had dared to drive over them." C. Richter, The Town, at 47.

Conrad Richter's novels about Sayward, her frontier family, and the transformation of her spot in Ohio from an unbroken canopy of trees to the Village of Moonshine Church to the town of Americus contain these descriptions of changes in walkways. These books cover the period from just after the Revolutionary War to just before the Civil War, a mere 75 years of history, but those years transported people's feet from deer trails to stone sidewalks. Cases in Illinois involving injuries from falls in the streets cover nearly twice the number of years spanned in Richter's novels, and the changes in attitudes toward them have been almost as dramatic as the changes in Sayward's spot.

Since the Tort Immunity Act, which begins the majority's discussion, imposes no new duties but simply articulates common law principles that existed prior to the Act's codification (*Santelli v. City of Chicago* (1991), 222 Ill. App. 3d 862, 867, 584 N.E.2d 456, 459), one of the first questions that needs to be answered is, What was the common law on the liability of municipalities for injuries caused to pedestrians by defects in the streets?

Interestingly enough, one of the common law's first concerns was not whether a duty was owed to those in the streets, but rather whether a duty was owed to those on the sidewalks. (*City of Bloomington v. Bay* (1867), 42 Ill. 503.) This seemingly inverted concern is, however, only a reflection of the historical development. Deer trails became paths; paths became roads that led to towns; then there were streets within towns, first without sidewalks and only later with them. Early Illinois courts had little trouble in imposing a duty on municipalities to provide reasonably safe public ways for their citizens, regardless of whether the way was a street or sidewalk. The recognition of this duty continued uninterrupted for well over 100 years. See *Browning v. City of Springfield* (1855), 17 Ill. 143.

The word "street" was recognized at common law as encompassing all urban ways which were generally used for ordinary purposes of travel. The sidewalk was considered to be a part of the street which the municipal authorities set apart for the use of pedestrians. (*City of Elmhurst v. Buettgen* (1946), 394 Ill. 248, 252, 68 N.E.2d 278, 281.) The purpose of a street, including sidewalks, is "to afford a way for traffic, both pedestrian and vehicular, to the public, and the public is rightfully entitled to the use of such thoroughfare." *People ex rel. Herman Armanetti, Inc. v. City of Chicago* (1953), 415 Ill. 165, 168, 112 N.E.2d 616, 617.

Early on, the common law recognized that a cause of action for damages resulting from negligence would lie against a municipality for injuries resulting from the negligent maintenance of the streets. (*Browning v. City of Springfield* (1855), 17 Ill. 143.) In the late 19th century municipalities were required to maintain streets (including sidewalks) for the foreseeable uses of the public without regard to the motives and objectives of those traversing them. In *City of Bloomington v. Bay* (1867), 42 Ill. 503, a pedestrian was injured while strolling along a city sidewalk, and the supreme court discussed the duty of a municipality with regard to maintaining streets and sidewalks.

> "[I]n a grant by the legislature of control over the streets of a city to the city authorities, control over the sidewalks passes to them, they being a part of the street. The charter of the city of Bloomington, giving control over the streets to the authorities of that city, also imposed upon them the duty of keeping them in repair, *and, as sidewalks are a part of the streets, a like duty is imposed to keep them in repair.*" (Emphasis added.) 42 Ill. at 507.

In *City of Chicago v. Keefe* (1885), 114 Ill. 222, 2 N.E. 267, a boy who was rolling a hoop along the sidewalk tripped on a loose plank, and subsequently died from injuries. The court held that "the duty of the city towards [the plaintiff] was precisely the same that it was towards a child of the same age and mental capacity, exercising the same degree of care, passing along the sidewalk without a hoop." (114 Ill. at 228, 2 N.E. at 269.) "[A]lthough a party may be doing an unlawful act at the time he is injured through the negligence of another, this will not prevent a recovery ***. [Citations.] Whether this child was guilty of contributive negligence, was a question of fact, to be determined by the jury ***." 114 Ill. at 228, 2 N.E. at 269.

The attitude of the courts with regard to maintenance of streets and sidewalks in the late 19th and early 20th centuries is exemplified by the statement in *Kohlhof v. City of Chicago* (1901), 192 Ill. 249,

251, 61 N.E. 446, 446, that "[a]ll portions of a public street, from side to side and end to end, are for the public use in the appropriate and proper method." In *City of Rock Island v. Larkin* (1907), 136 Ill. App. 579, 585, the court held that the designation of a street as a sidewalk for the use of pedestrians and a portion for a driveway does not deprive those who have occasion or desire to go from one to the other from doing so. In that case the plaintiff recovered for injuries sustained when she retrieved milk from a milk wagon parked in the street and tripped over a valve box protruding from an area beyond the sidewalk.

In *Molway v. City of Chicago* (1909), 239 Ill. 486, 88 N.E. 485, the court held that when highways are not restricted by their dedication or statute to some particular mode of use, they are open to all suitable methods of travel. The supreme court expanded on this idea in *VanCleef v. City of Chicago* (1909), 240 Ill. 318, 326, 88 N.E. 815, when it stated, "The liability of the city is, of course, not confined to travelers, but extends to a person stopping on the street to converse with another, or stopping to see a procession pass, or using the street for convenience or pleasure, and there are liabilities to abutting owners and to children playing upon the street."

In *City of Rock Island v. Larkin* (1907), 136 Ill. App. 579, the court described the nexus between a municipality's duty to maintain its streets and a person's duty to exercise reasonable care for his/her own safety:

> "A person using any portion of a street must use ordinary care for his own safety. What might be ordinary care for a foot passenger on the sidewalk would not be ordinary care for a passenger walking across the area between the sidewalk and the portion devoted to the use of vehicles. It is sufficient we think if the streets (which include sidewalks and bridges thereon) are in a reasonably safe condition for travel in the ordinary modes, by night as well as by day; and whether they are so or not is a practical question to be determined in each case by its particular circumstances." (136 Ill. App. at 585-86.)

This balancing of interests was discussed further in *Boender v. City of Harvey* (1911), 251 Ill. 228, 95 N.E. 1084:

> "The object to be secured is reasonable safety for travel, considering the amount and kind of travel which may fairly be expected upon the particular road or street. A highway in the country need not be of the same character as a street in a large city." 251 Ill. at 230-31, 95 N.E. at 1085.

Through the first half of this century the courts continued to follow the principle that a municipality's duty is to exercise ordinary care to keep its streets reasonably safe for persons who exercise ordinary care. See *Brennan v. City of Streator* (1912), 256 Ill. 468, 100 N.E. 266; *Storen v. City of Chicago* (1940), 373 Ill. 530, 27 N.E.2d 53.

The preceding historical review, beginning with the 1855 supreme court decision *Browning v. City of Springfield* (1855), 17 Ill. 143, and leading up to the Tort Immunity Act, brings us to the point where the majority begins its opinion in this case. That is, with a discussion of the Tort Immunity Act. This is also the appropriate point to ask the next question in this analysis: what change, if any, did the Tort Immunity Act make in the responsibility of municipalities for persons injured due to defects in the streets?

Until the enactment of the Tort Immunity Act, the supreme court's decisions espoused the traditional rule that municipalities have an obligation to maintain streets and sidewalks in a reasonably safe condition. "The *** Tort Immunity Act, which was enacted at least in part as a result of this court's rejection of the principles underlying the sovereign immunity doctrine in *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11[, 163 N.E.2d 89], is in derogation of the common law action against governmental entities and specifies certain limitations on the liability of such bodies." (*Vesey v. Chicago Housing Authority* (1991), 145 Ill. 2d 404, 412, 583 N.E.2d 538, 542; *Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 164, 456 N.E.2d 116, 119; *Helle v. Brush* (1973), 53 Ill. 2d 405, 407, 292 N.E.2d 372, 374; *Reynolds v. City of Tuscola* (1971), 48 Ill. 2d 339, 342, 270 N.E.2d 415, 417.) The Tort Immunity Act explicitly states that its purpose "is to protect local public entities and public employees from liability arising from the operation of government. It grants only immunities and defenses." (Ill. Rev. Stat. 1991, ch. 85, par. 1—101.1(a).) The Tort Immunity Act does not impose on a municipality any new duties but simply articulates common law principles that existed prior to the Act's codification.

In recent years there have been numerous cases involving injuries caused to pedestrians by defects in the streets. The majority of these cases have been decided in favor of the defendant. The cases of *Renk v. City of Chicago* (1st Dist. 1992), No. 1—91—3205 (unpublished order under Supreme Court Rule 23), *Mason v. City of Chicago* (1st Dist. 1988), 173 Ill. App. 3d 330, 527 N.E.2d 572, and *Vance v. City of Chicago* (1st Dist. 1990), 199 Ill. App. 3d 652, 557 N.E.2d 494, concerned pedestrians who crossed the street outside the crosswalk and were injured due to a hole in the street. The *Renk, Mason* and *Vance*

courts found that the pedestrians using the public streets as a walkway were not intended and permitted users of the street as required under the Tort Immunity Act. In *Householder v. City of Bunker Hill* (4th Dist. 1988), 172 Ill. App. 3d 1037, 527 N.E.2d 528, a pedestrian was injured when she fell into a manhole in the street while pushing an automobile. The court held that the city had no duty to protect the pedestrian from the danger of falling into the manhole in the street.

The cases are not all in the defendant's favor, however. In *Di Domenico v. Village of Romeoville* (3d Dist. 1988), 171 Ill. App. 3d 293, 525 N.E.2d 242, the plaintiff was injured when he stepped into a pothole at the curbside while attempting to obtain items from the trunk of his legally parked car. The court held that the plaintiff did have a cause of action against the city based on the facts alleged.

> "It is common knowledge that, unless parking is specifically prohibited on a street, the operators of vehicles regularly and customarily, both in business districts and residential areas, park their vehicles either parallel to or at an angle to the curb. It defies common sense to conclude that such local entities did not contemplate and intend that the operator of the vehicle along with passengers would use the street area around the parked vehicle for ingress and egress to and from their vehicle." *Di Domenico*, 171 Ill. App. 3d at 295-96, 525 N.E.2d at 243.

The first district case of *Torres v. City of Chicago* (1991), 218 Ill. App. 3d 89, 578 N.E.2d 158, involves facts similar to those in *Di Domenico*. In *Torres* the plaintiff was injured when he fell in a pothole while removing groceries from the trunk of his legally parked car. The court held that the trial court erred in entering summary judgment for the defendant:

> "We agree with plaintiff's contention that because the City permits parking on Barry Street, pedestrian use of the immediate area around the parked vehicle for ingress and egress to and from the vehicle was intended and permitted within the meaning of the Tort Immunity Act." *(Torres*, 218 Ill. App. 3d at 91, 578 N.E.2d at 159.)

*Torres*, as well as *Renk v. City of Chicago* discussed earlier, currently have petitions for leave to appeal pending before the Illinois Supreme Court. (*Torres v. City of Chicago*, No. 72380; *Renk v. City of Chicago*, No. 74453.) The supreme court has not ruled on the petitions for leave to appeal in either case.

In support of its position, the majority cites seven appellate court decisions which state that a municipality owes no duty to pedestrians

who use the public streets, outside the crosswalk, as walkways. (*Curatola v. Village of Niles* (1992), 230 Ill. App. 3d 743, 598 N.E.2d 945; *Ramirez v. City of Chicago* (1991), 212 Ill. App. 3d 751, 571 N.E.2d 822; *Greene v. City of Chicago* (1991), 209 Ill. App. 3d 311, 567 N.E.2d 1357; *Vlahos v. City of Chicago* (1990), 198 Ill. App. 3d 911, 556 N.E.2d 660; *Mason v. City of Chicago* (1988), 173 Ill. App. 3d 330, 527 N.E.2d 572; *Risner v. City of Chicago* (1986), 150 Ill. App. 3d 827, 502 N.E.2d 357; *Deren v. City of Carbondale* (1973), 13 Ill. App. 3d 473, 300 N.E.2d 590.) Five of those decisions, each from the first district of the appellate court, involve pedestrians outside the crosswalk who either tripped or fell as a result of an alleged physical defect in the street. (*Curatola,* 230 Ill. App. 3d 743, 598 N.E.2d 945; *Ramirez,* 212 Ill. App. 3d 751, 571 N.E.2d 822; *Greene,* 209 Ill. App. 3d 311, 567 N.E.2d 1357; *Vlahos,* 198 Ill. App. 3d 911, 556 N.E.2d 660; *Mason,* 173 Ill. App. 3d 330, 527 N.E.2d 572.) *Risner,* also from the first district, involves a pedestrian who was struck by a bus while walking outside the crosswalk. *Deren,* from the fifth district, involves a pedestrian who was hit by a car. While these, and the other appellate court decisions discussed earlier are important, I think that at this point an examination of three supreme court decisions involving the Tort Immunity Act is in order.

In *Curtis v. County of Cook* (1983), 98 Ill. 2d 158, 456 N.E.2d 116, plaintiff sued the municipality for injuries sustained when the car in which she was a passenger went out of control and struck a signpost while speed-clocking. The court held that the Tort Immunity Act, which defines the scope of immunity for injuries arising out of the use of public property, did not support a finding that there was a statutory property-related duty to the plaintiff. The court held that the Act "evinces a legislative intent to extend a duty of care only to those persons by whom the local government intended the property to be used. As a passenger in a speed-clocking automobile, [plaintiff] cannot be said to fall within the class of motorists by whom defendant's highways were intended to be used." (98 Ill. 2d at 164-65.) The significance of *Curtis* is the court's recognition that the Tort Immunity Act extends a duty of care "only to those persons by whom the local government intended the property to be used." (98 Ill. 2d at 164-65.) The *Curtis* court declined to discuss the meaning of the word *intended.*

The supreme court interpreted the Tort Immunity Act again in *Marshall v. City of Centralia* (1991), 143 Ill. 2d 1, 570 N.E.2d 315, a case in which a minor was injured when he left the sidewalk to avoid a muddy condition and fell into an open sewer manhole in the parkway. In *Marshall* the court took up where it left off in *Curtis,* by

delving into the meaning of the word *intended* as used in the Tort Immunity Act. As stated by the court:

> "Intent, being a mental state, can rarely be discerned from direct proof and must ordinarily be *inferred from the facts*. [Citation.] After carefully considering the foregoing authorities, the arguments raised in the briefs, the facts in the record and the reasonable inferences to be drawn therefrom, we conclude that the plaintiff was an intended and permitted user of the parkway." (Emphasis added.) (143 Ill. 2d at 9, 570 N.E.2d at 319.)

The *Marshall* court held that the city owed the plaintiff a duty to exercise ordinary care to maintain the parkway in a reasonably safe condition for the benefit of the plaintiff. (143 Ill. 2d at 9, 570 N.E.2d at 319.) The court noted that it found the comments in *Jablonski v. City of Bay City* (1929), 248 Mich. 306, 226 N.W. 865, a case involving a pedestrian injured in a parkway, to be particularly instructive:

> " '[T]he city cannot lawfully, by the mere provision of suitable passageways for pedestrians, maintain dangerous and unreasonable obstructions or conditions *** at places where people may reasonably be expected to go. *** *It cannot confine its citizens in a traffic groove. It must take into account the natural inclination of children to run about in play and the perverse insistence of adults to cut corners and cross streets* and grass plats instead of following precisely the beaten or provided path. *Such departure from the sidewalk is not negligence per se in the individual, nor does it relieve the city of the duty to keep its streets in proper condition for travel at the places where people may reasonably be expected probably to walk.*' " (Emphasis added.) *Marshall*, 143 Ill. 2d at 10, 570 N.E.2d at 319, quoting *Jablonski*, 248 Mich. at 309-10, 226 N.W. at 866.

It is clear that the supreme court in *Marshall* does not establish a bright-line test for determining municipal liability with regard to streets, parkways and sidewalks. On the contrary, the court explains that *intent* must usually be inferred from the facts of the particular case. The court then quotes a passage from *Jablonski* which suggests that a municipality's duty to maintain its streets may in certain situations extend to pedestrians. The majority in the case at bar does not mention *Marshall* but focuses instead on the First District Appellate Court cases and the supreme court case of *Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 592 N.E.2d 1098.

The majority states that *Wojdyla* stands for the proposition that no duty attaches when pedestrians cross the street outside of a crosswalk. While the *Wojdyla* court may have found that no duty attached

to the municipality under the facts of that case, *Wojdyla* involved very distinctive facts. The plaintiff was killed while attempting to walk across a six-lane highway where the posted speed limit was 40 miles per hour. The complaint alleged that the highway was inadequately illuminated and did not allege that there was a physical defect in the road itself. Plaintiff did not trip or fall in a defect in the road; he was struck by a car.

.*Wojdyla* does not adopt a bright-line test that no duty attaches to pedestrians walking outside of crosswalks. In determining whether a plaintiff is an "intended and permitted" user of the municipality's property, the municipality's intent must ordinarily be inferred from the facts. (*Marshall*, 143 Ill. 2d at 9, 570 N.E.2d at 319.) In *Wojdyla* the court stated: "To determine the intended use of the property involved here, we need look no further than the property itself." (*Wojdyla*, 148 Ill. 2d at 426, 592 N.E.2d at 1102.) In *Wojdyla* the facts are that the property was a six-lane highway, marked with lines and signs to guide vehicular traffic. The overhead streetlights were designed with the specific intent that they would light the way for fast-moving vehicles. It is significant that the *Wojdyla* court further found that the developer of modern highways designs for the benefit of automobiles and other vehicles, not for pedestrians. The court noted that modern highways are rarely designed with pedestrians in mind. (*Wojdyla*, 148 Ill. 2d at 424, 592 N.E.2d at 1101.) While *highways* may rarely be designed for the use of pedestrians, the court does not rule out liability in situations, such as subdivisions without sidewalks, where *city streets* may be used by pedestrians and vehicles alike.

I read *Wojdyla* with a sigh of relief, for in this age of modern highways designed solely for the purpose of vehicular traffic, it is comforting to know that the supreme court still recognizes that streets may at times be used for nonvehicular functions. St. Patrick's, Casimir Pulaski's, and Veteran's Day parades, as well as summer street festivals come to mind, but these are infrequent. More frequent are the drivers of vehicles who exit from them on the street side every day. Add to these the school children and the elderly who use the streets as sidewalks in subdivisions where sidewalks are not provided and the citizens who live in the middle of the block and who *never* walk to the end of the block to use the crosswalk in order to visit their neighbor across the street, and it is obvious that city streets are *routinely* used by pedestrians. Some courts have allowed recovery to pedestrians injured in streets; more have not. In addition to the cases discussed earlier, see *Jorgensen v. Whiteside* (1992), 233 Ill. App. 3d 783, 599 N.E.2d 1009 (decision for the plaintiff), *Swett v.*

*Village of Algonquin* (1988), 169 Ill. App. 3d 78, 523 N.E.2d 594 (decision for the defendant), *Horrell v. City of Chicago* (1986), 145 Ill. App. 3d 428, 495 N.E.2d 1259 (decision for the defendant), and *Palladini v. City of East Peoria* (1985), 134 Ill. App. 3d 345, 480 N.E.2d 530 (decision for the plaintiff).

In my judgment the duty question should not be based on whether the plaintiff is getting out of a lawfully parked car, or crossing a street within a crosswalk, or any other exception or limitation that has been utilized to either impose liability or to deny it. The duty of the municipality should be to provide sidewalks and parkways (and streets and alleys) that are in a reasonably safe condition. That was the duty imposed by the common law, and that duty is the same under the Tort Immunity Act. Once that duty is recognized, the question of whether the duty has been breached can be more properly analyzed. While a two- or three-inch difference in heights between sidewalk slabs might be considered a breach of the duty for sidewalks, that same difference might not be a breach if it was between two concrete slabs in the middle of a city street. Would anyone argue, however, that a city would not have a duty to barricade, fence, pave over, or otherwise do something about a 10-foot-wide pit filled with crocodiles, whether that pit was in a sidewalk, on the parkway beside the sidewalk, or in the middle of a street? The city's duty is the same whether it is a sidewalk or a street, "to maintain *its property* in a reasonably safe condition for the use in the exercise of ordinary care of people." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 85, par. 3—102(a).) Neither the common law nor the Tort Immunity Act distinguishes between types of *property*; some courts have done so since the passage of the Act, and in my judgment, they are mistaken.

I could and perhaps should end the dissent at this time, but I want to address one further point because it may be the source of some of the difficulty in this area, and that is the construction of the "intended and permitted" language of section 3—102(a) of the Tort Immunity Act.

The Act provides:

> "Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people *whom the entity intended and permitted to use the property* in a manner *in which and at such times as it was reasonably foreseeable* that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a con-

dition that is not reasonably safe in sufficient time prior to an injury to have taken measures to remedy or protect against such condition." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 85, par. 3—102(a).)

If we ignore the emphasized portions of the Act for a moment, it is clear that the remainder of the Act imposes the general common law duty of exercising ordinary care for the safety of others. What then is the concern of the emphasized portions of the Act? That language is concerned with to whom and under what circumstances the city owes its duty of ordinary care, and I submit that the confusion between these two is the source of some of the difficulty in this area.

There is no legislative history available for section 3—102(a), but a logical purpose of inserting "people whom the entity intended and permitted to use the property" would have been to differentiate between the common law classes of licensees, invitees, and trespassers which were still recognized at the time of the passage of the Act. A municipality has certain property such as streets and sidewalks which are intended to be used by all, *i.e.*, the city would permit anyone to use these portions of its property. The city has other property, however, such as garages and offices, that it neither intends, nor would it permit, everyone to use. This limitation, however, is on the *people* who use the property, not on the use they make of it. It is important to note that *"whom* the city intended and permitted" (emphasis added) refers to and modifies "people." See *People v. Thomas* (1970), 45 Ill. 2d 68, 256 N.E.2d 794.

The other limitation in section 3—102(a), "use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used," deals with the foreseeability of the uses to which the property will be put. In my judgment, the courts have confused these two concepts. For example, *Risner v. City of Chicago* (1986), 150 Ill. App. 3d 827, 502 N.E.2d 357, affirmed a summary judgment for the defendant in a case involving a jaywalker struck by a Chicago Transit Authority bus:

"Here, as mentioned above, Adams Street is for the use of vehicular traffic, and jaywalkers are not intended or permitted users and not, therefore, users making use of the street in a foreseeable manner." (150 Ill. App. 3d at 831, 502 N.E.2d at 360.)

The unfortunate mixture of the use and the intended and permitted users is apparent in the quotation. Who were the "people" in *Risner*? Presumably, he was a citizen of Chicago. Did the city intend him to jaywalk? No. Did it permit jaywalking? No. But, does either of the lat-

ter two questions have anything to do with whether a citizen of Chicago is "intended and permitted to use the property," the public streets of the city? No. Quite obviously, the plaintiff was both intended and permitted to use the street. What then is the problem? The problem the court apparently had was the manner in which he used the street, *i.e.*, the fact that he was jaywalking. Again, while jaywalking may not be either intended or permitted conduct, the people who do the jaywalking are intended and permitted users of property. The jaywalking clearly brings the second emphasized limitation, "in a manner in which and at such times as it was reasonably foreseeable that it would be used," into play. I am not interested in second-guessing every element of the first district's analysis in *Risner*, but from what I have said earlier, it should be apparent that I would consider jaywalking in certain areas to be reasonably foreseeable conduct. I am more concerned, however, with *Risner's* conclusion on the "intended and permitted" language of section 3—102(a), a conclusion which, while it may have been permitted, was not, in my judgment, intended by the legislature.

For the foregoing reasons, I respectfully dissent.