MELBA VAUGHN, Plaintiff-Appellant, v. THE CITY OF WEST FRANK-FORT, Defendant-Appellee.

Fifth District    No. 5—92—0867

Opinion filed March 11, 1994.

WELCH, J., dissenting.

Mark D. Prince, of R. Courtney Hughes & Associates, of Carbondale, for appellant.

Joseph A. Bleyer, of Bleyer & Bleyer, of Marion, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

"The tree the tempest with a crash of wood
Throws down in front of us is not to bar
Our passage to our journey's end for good,
But just to ask us who we think we are

Insisting always on our own way so.
She likes to halt us in our runner tracks,
And make us get down in a foot of snow
Debating what to do without an ax.

And yet she knows obstruction is in vain:
We will not be put off the final goal
We have it hidden in us to attain,
Not though we have to seize earth by the pole

And, tired of aimless circling in one place,
Steer straight off after something into space."

R. Frost, *On a Tree Fallen Across the Road (To Hear Us Talk)*, in The Complete Poems of Robert Frost 296 (1967).

---

"The woods looked ragged too, they have timbered out all the big trees, and it's not much along there now but scrub pines. The big tulip poplars are all gone. So I was glad when we left the bottom, and started up Sugar Fork. The trace had gotten so overgrown that we had to keep stopping to move logs and branches that had fallen across it ***.

We had to walk through briars and branches to the house, our feet slipping on the wet stones. And then for a minute I got real scared *** but then when I stopped to try to breathe, I looked down and seen something I had not seen since we left there, those little yellow beauties and blue-eyed grass that come first every year on the mountains, don't you remember too?" L. Smith, Fair and Tender Ladies at 185-86 (1988).

---

The travelers in Robert Frost's poem are conceptually able to leap from their tree-blocked sleigh toward their undefined galactical goals. The indomitable Ivy of Lee Smith's novel will always triumph over whatever trees are placed in her path to return to her home on the Sugar Fork of Home Creek. Melba Vaughn's more pedestrian attempt to cross the street to reach the paved sidewalk on the other side was not as successful, but all travelers share the human characteristic of a determination to reach a goal undaunted by obstructions. One hundred years ago the supreme court noted that pedestrians cross roadways at points not sanctioned by the city:

"We are not prepared to hold that the duty of a city to keep its street crossings in a reasonably safe condition for the use of foot-passengers arises only when it sees fit, in the exercise of its discretion, to construct an artificial crossing over the street. And much less are we disposed to hold that, after a street-crossing has been established, *de facto*, by public use, the city is at liberty, merely because no artificial crossing has been constructed, to intersect the crossing which the public have established for themselves, with dangerous ditches and pit-falls. We are of the opinion that, under the facts which the evidence in the case tended to establish, the duty of the city to keep the crossing in question in a reasonably safe condition and repair for the use of pedestrians had arisen ***." (*City of Beardstown v. Smith* (1894), 150 Ill. 169, 174-75, 37 N.E. 211, 213.)

Throughout this century our supreme court has recognized that pedestrians have a natural inclination to choose a path which will lead to their destination. In 1909 the court stated:

"The liability of the city is, of course, not confined to travelers, but extends to a person stopping on the street to converse with another, or stopping to see a procession pass, or using the street for convenience or pleasure ***." (*VanCleef v. City of Chicago* (1909), 240 Ill. 318, 326, 88 N.E. 815, 817.)

And, in 1991, the court held:

> "The city cannot lawfully, by the mere provision of suitable passageways for pedestrians, maintain dangerous and unreasonable obstructions or conditions *** *at places where people may reasonably be expected to go.* *** It cannot confine its citizens in a traffic groove. It must take into account the natural inclination of children to run about in play and the perverse insistence of adults to cut corners *and cross streets* and grass plats instead of following precisely the beaten or provided path." (Emphasis added.) *Marshall v. City of Centralia* (1991), 143 Ill. 2d 1, 10, 570 N.E.2d 315, 319.

At approximately 10:30 p.m. on June 28, 1991, Melba Vaughn was walking on the east side of Jefferson Street in the City of West Frankfort (the City). At mid-block she stepped into and began crossing Jefferson Street in order to reach the sidewalk which ran to the middle of the block on the west side of Jefferson Street. While crossing the street, she stepped into a hole, fell, and injured her leg and hip. Vaughn filed a complaint which alleged these facts. The City filed a motion to dismiss under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)). The trial court granted the motion. We reverse.

To properly state a cause of action for negligence, the plaintiff must establish that the defendant owed a duty of care, a breach of that duty, and an injury proximately caused by the breach. (*Marshall v. City of Centralia* (1991), 143 Ill. 2d 1, 6, 570 N.E.2d 315, 317.) The city claims it has no duty because of the immunity granted it by the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act):

> "[A] local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used." 745 ILCS 10/3—102 (West 1992).

At the heart of this case is whether the plaintiff can be considered an intended and permitted user of Jefferson Street when crossing it at mid-block to get to a sidewalk. What is meant by the word *permitted* in the Tort Immunity Act has not been addressed in any detail by the supreme court. In addition, there is no legislative history available for section 3—102(a) of the Tort Immunity Act. However, the word *permit* is defined by Black's Law Dictionary:

> "To suffer, allow, consent, let; to give leave or license; to acqui-

esce, by failure to prevent, or to expressly assent or agree to the doing of an act." (Black's Law Dictionary 1026 (5th ed. 1979).)

Was plaintiff a permitted user of the street? To assist us in this inquiry we examine section 11—1003 of the Illinois Vehicle Code, which provides in part:

"(a) Every pedestrian crossing a roadway at any point *other* than within a marked crosswalk \*\*\* shall yield the right-of-way to all vehicles upon the roadway.

\*\*\*

(c) *Between adjacent intersections at which traffic-control signals are in operation* pedestrians shall not cross at any place except in a marked crosswalk." (Emphasis added.) (625 ILCS 5/11—1003(a), (c) (West 1992).)

While section 11—1003 is obviously intended to encourage or to require pedestrians to use crosswalks, subsection (a) recognizes that pedestrians are permitted to cross a roadway at a point "other" than within a marked crosswalk. In addition, subsection (b) implies that at all intersections, except those defined in the statute, a pedestrian may cross outside a crosswalk.

Section 11—1007 of the Illinois Vehicle Code provides in part:

"(a) *Where a sidewalk is provided and its use is practicable*, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway.

(b) Where a sidewalk is not available, any pedestrian walking along and upon a highway shall walk only on a shoulder, as far as practicable from the edge of the roadway.

(c) Where neither a sidewalk nor a shoulder is available, any pedestrian walking along and upon a highway shall walk as near as practicable to an outside edge of a roadway \*\*\*.

(d) Except as otherwise provided in this Chapter, any pedestrian upon a roadway shall yield the right-of-way to all vehicles upon the roadway." (Emphasis added.) (625 ILCS 5/11—1007 (West 1992).)

Again, while the primary emphasis of the statute is to limit and regulate pedestrian use of roadways, *none* of its subsections *prohibit* pedestrian use of the roadway. Instead, each of the sections implicitly recognizes that pedestrian use of the roadway is permitted. Indeed, subsection (a), the one that comes closest to a prohibition with its "it shall be unlawful" language explicitly recognizes that the prohibition does not apply unless: (1) "a sidewalk is provided" *and* (2) "its use is practicable." Therefore, at any time that these two conditions are not met, pedestrian use of the street is not prohibited, and if it is not prohibited, it is permitted.

We acknowledge that pedestrians are not the *primary* users of

roadways as they were in times past. However, the purpose of a street, including sidewalks, has historically been to afford a way for traffic, both pedestrian and vehicular, and the public is rightfully entitled to the use of such thoroughfare. (*People ex rel. Herman Armanetti, Inc. v. City of Chicago* (1953), 415 Ill. 165, 168, 112 N.E.2d 616, 617.)

> "As a matter of common knowledge, pedestrians upon highways running through the country use, and have a right to use, such highways, as well as the autoist, and both hold a mutual obligation, each to the other, to observe their reciprocal rights." (*Blumb v. Getz* (1937), 366 Ill. 273, 277, 8 N.E.2d 620, 622.)

For a limited historical analysis of the use of streets, see *Gabriel v. City of Edwardsville* (1992), 237 Ill. App. 3d 649, 653, 604 N.E.2d 565, 568 (Chapman, J., dissenting).

■ In light of the Illinois Vehicle Code, which suggests that pedestrians are permitted users of the street, and the historical treatment of pedestrians, we conclude the trial court erred in determining that plaintiff was not a permitted user of the roadway in this case. While no longer the *primary* users, pedestrians are *permitted* users of the streets and roadways.

We now turn to whether plaintiff was an *intended* user of the street as that word is construed in the Tort Immunity Act. The supreme court recently discussed this issue:

> "Intent, being a mental state, can rarely be discerned from direct proof and must ordinarily be inferred from the facts. (Black's Law Dictionary 727 (5th ed. 1979).)" (*Marshall*, 143 Ill. 2d at 10, 570 N.E.2d at 319.)

The court further stated:

> "It [the city] cannot confine its citizens in a traffic groove. It must take into account the natural inclination of children to run about in play and the perverse insistence of adults to cut corners *and cross streets* and grass plats instead of following precisely the beaten or provided path." (Emphasis added.) *Marshall*, 143 Ill. 2d at 10, 570 N.E.2d at 319.

In discussing whether the pedestrian was an *intended* user of the parkway, the *Marshall* court was confronted with the threat that if a municipality has a duty to maintain its parkways for pedestrian use, municipalities will be forced to maintain parkways much like they care for sidewalks, thereby unduly burdening municipal finances. (*Marshall*, 143 Ill. 2d at 10, 570 N.E.2d at 319.) Defendant argues that if a duty is found to exist in this case the municipality will be forced to care for its streets in the same manner as it cares for its sidewalks. This is simply incorrect, as the supreme court has held:

> "[T]he duty of care with regard to parkways is not identical to the

duty of care with regard to sidewalks. Pedestrians who leave the sidewalk cannot assume that parkways are free of defects or undulations as they otherwise could when traveling on the sidewalk. Sidewalks are generally made of cement, while parkways are composed of sod and earth and are therefore more susceptible to weather damage caused by rain and snow. [Citation.] Municipalities cannot be held liable for parkway conditions which are customary, even though such conditions may be slightly dangerous. [Citation.] '*However a city has no right to maintain anything in the nature of a pitfall, trap, snare or other like obstruction whereby the traveler*, in yielding to the impulse of the average person to cut across a corner in a hurry, *may be injured* \*\*\*.' " (Emphasis added.) *Marshall*, 143 Ill. 2d at 10-11, 570 N.E.2d at 319-20.

Just as "the duty of care with regard to parkways is not identical to the duty of care with regard to sidewalks," so too the duty of care with regard to streets is not identical to the duty of care with regard to either parkways or sidewalks. We need not concern ourselves with what type or size of defect would constitute a breach of the duty of care in each instance because the important point is, as both Einstein and Oedipus might have said, "Everything is relative." For further discussion of "intended and permitted," see the dissenting opinion in *Gabriel v. City of Edwardsville* (1992), 237 Ill. App. 3d 649, 653, 604 N.E.2d 565 (Chapman, J., dissenting).

As stated earlier, the dissent in *Gabriel* examined the historical development of the duty question in Illinois. At this point in our discussion, we take a moment to reflect on similar cases decided in more recent years and to examine the factual patterns in those cases.

One cannot help but notice that cases decided since 1973 involving pedestrians who were *struck by vehicles* while walking upon the street outside of the crosswalk almost unanimously find in favor of the defendant on the question of whether the city had a duty toward the plaintiff-pedestrian. (See *Deren v. City of Carbondale* (1973), 13 Ill. App. 3d 473, 300 N.E.2d 590; *Eddings v. Dundee Township Highway Commissioner* (1985), 135 Ill. App. 3d 190, 478 N.E.2d 888; *Horrell v. City of Chicago* (1986), 145 Ill. App. 3d 428, 495 N.E.2d 1259; *Risner v. City of Chicago* (1986), 150 Ill. App. 3d 827, 502 N.E.2d 357; *Swett v. Village of Algonquin* (1988), 169 Ill. App. 3d 78, 523 N.E.2d 594; *Mitchell v. City of Chicago* (1991), 221 Ill. App. 3d 1017, 583 N.E.2d 60; *Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 592 N.E.2d 1098; *cf. Jorgensen v. Whiteside* (1992), 233 Ill. App. 3d 783, 599 N.E.2d 1009.) In fact, the supreme court recently held that a city has no duty to a pedestrian who is struck by a vehicle outside a crosswalk on a six-lane roadway. (*Wojdyla v. City of Park*

*Ridge* (1992), 148 Ill. 2d 417, 592 N.E.2d 1098.) It soon becomes apparent, however, that when we traverse from cases involving pedestrians struck by vehicles to pedestrians injured by defects in the street, unanimity is absent.

Within just the past six years several appellate court decisions have affirmed summary judgments against pedestrians who were injured when they tripped on a defect in the street outside the crosswalk. *Mason v. City of Chicago* (1988), 173 Ill. App. 3d 330, 527 N.E.2d 572; *Householder v. City of Bunker Hill* (1988), 172 Ill. App. 3d 1037, 527 N.E.2d 528 (open manhole); *Vlahos v. City of Chicago* (1990), 198 Ill. App. 3d 911, 556 N.E.2d 660; *Vance v. City of Chicago* (1990), 199 Ill. App. 3d 652, 557 N.E.2d 494; *Greene v. City of Chicago* (1991), 209 Ill. App. 3d 311, 567 N.E.2d 1357; *Ramirez v. City of Chicago* (1991), 212 Ill. App. 3d 751, 571 N.E.2d 822 (ridges in street); *Wolowinski v. City of Chicago* (1992), 238 Ill. App. 3d 639, 606 N.E.2d 273; *Gabriel v. City of Edwardsville* (1992), 237 Ill. App. 3d 649, 604 N.E.2d 565; *Poindexter v. City of Chicago* (1993), 247 Ill. App. 3d 47, 617 N.E.2d 206.

There is a lack of unanimity in this area, however, because courts have also found that cities have duties toward pedestrians when they are injured by defects in the streets. *Di Domenico v. Village of Romeoville* (1988), 171 Ill. App. 3d 293, 525 N.E.2d 242, reversed the trial court's dismissal of plaintiff's claim against the village. In *Di Domenico*, the plaintiff sustained injuries when he stepped into a pothole while retrieving items from the trunk of his legally parked vehicle.

> "[T]he defendant Village permitted curbside parking on Garland Street so it must have recognized the necessity of pedestrians walking in the street and using a portion of it as a pathway, as means of ingress and egress to and from their vehicles. It is common knowledge that, unless parking is specifically prohibited on a street, the operators of vehicles regularly and customarily, both in business districts and residential areas, park their vehicles either parallel to or at an angle to the curb. It defies common sense to conclude that such local entities did not contemplate and intend that the operator of the vehicle along with passengers would use the street area around the parked vehicle for ingress and egress to and from their vehicle." (*Di Domenico*, 171 Ill. App. 3d at 295, 525 N.E.2d at 243.)

In a similar case, *Torres v. City of Chicago* (1991), 218 Ill. App. 3d 89, 578 N.E.2d 158, the court reversed a summary judgment in favor of the city. In *Torres*, like *Di Domenico*, plaintiff was injured when he stepped into a pothole while retrieving groceries from his vehicle which was legally parked curbside.

*Torres* and *Di Domenico* are factually similar to *Curatola v. Village of Niles* (1993), 154 Ill. 2d 201, 608 N.E.2d 882, in which the plaintiff was injured when he fell into a pothole while unloading his legally parked delivery truck. *Curatola* determined that the plaintiff was a permitted and intended user of the street immediately around his legally parked vehicle, and the municipality owed the plaintiff a duty. *Curatola*, 154 Ill. 2d at 215, 608 N.E.2d at 888.

This dichotomy in the resolution of the duty question that exists between cases involving pedestrians struck by vehicles and pedestrians injured by defects in roadways can be resolved by a close examination of the statutes quoted earlier in this opinion and by a comparison of two recent supreme court cases.

The statutes which limit and regulate pedestrian traffic on roadways are clearly concerned not with possible dangers from roadway defects but with protecting pedestrians from the vehicles that are the primary users of the roads. Consequently, it is understandable that almost all courts which have decided the duty question in cases involving jaywalking pedestrians struck by cars have resolved the issue against the pedestrians. In our judgment, however, it is unfortunate that the duty question raised when a pedestrian is injured because of a defect in the street is sometimes resolved in the same way. The (1) relative dangers, (2) likelihood of injury, (3) potential seriousness of the injury, (4) cost of guarding against injury, and (5) foreseeability of the injury are not the same in the two types of cases. In short, the factors that courts consider in determining the existence of a duty (*Curatola*, 154 Ill. 2d at 214, 608 N.E.2d at 888) differ in these two types of cases, and these differences warrant different treatment for pedestrians injured by roadway defects.

This difference in treatment toward plaintiffs, or to put it a different way, a difference in the recognition of a duty, is exemplified by the supreme court's decisions in *Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 592 N.E.2d 1098, and *Curatola v. Village of Niles* (1993), 154 Ill. 2d 201, 608 N.E.2d 882.

The City argues that *Wojdyla* and *Curatola* establish that a pedestrian is not an intended user of the street outside a crosswalk and that no duty attaches when pedestrians cross the street outside a crosswalk. Our analysis of those cases, however, leads us to the opposite conclusion. In fact, while *Mason v. City of Chicago* (1988), 173 Ill. App. 3d 330, 527 N.E.2d 572, misapplied the pedestrian-vehicle holdings of *Risner v. City of Chicago* (1986), 150 Ill. App. 3d 827, 502 N.E.2d 357, and *Deren v. City of Carbondale* (1973), 13 Ill. App. 3d 473, 300 N.E.2d 590, to its pedestrian-pothole factual situation, we conclude that the supreme court has recognized that misap-

plication by its decisions in *Wojdyla* and *Curatola*. The court held that there was no duty in *Wojdyla* but that there was a duty in *Curatola*.

In *Wojdyla*, the plaintiff was killed while attempting to cross a six-lane highway with a posted speed limit of 40 miles per hour. The *Wojdyla* court stated, "To determine the intended use of the property involved here, we need look no further than the property itself." (*Wojdyla*, 148 Ill. 2d at 426, 592 N.E.2d at 1102.) The court recognized that multiple-lane highways are rarely designed for the use of pedestrians, and the purpose of the highway in that case precluded characterizing the plaintiff's use of it as an intended one. (*Wojdyla*, 148 Ill. 2d at 426, 592 N.E.2d at 1101.) The court concluded that the plaintiff was not an intended and permitted user of the property, and the court upheld the summary judgment in defendant's favor.

In *Curatola v. Village of Niles* (1993), 154 Ill. 2d 201, 608 N.E.2d 882, the plaintiff was injured when he fell into a pothole while he was unloading his legally parked delivery truck. The supreme court reversed the lower court's summary judgment in favor of the defendant. The court determined that under the facts presented, the plaintiff was a permitted and intended user of the street immediately around his legally parked vehicle, and consequently, the municipality owed the plaintiff a duty. *Curatola*, 154 Ill. 2d at 215, 608 N.E.2d at 888.

When *Wojdyla* and *Curatola* are compared, and when we reflect upon the underlying bases for the imposition of a duty (*Harnischfeger Corp. v. Gleason Crane Rentals, Inc.* (1991), 223 Ill. App. 3d 444, 585 N.E.2d 166), and when we realize the differences between the bases for pedestrian-vehicle cases and pedestrian-defect cases, it becomes clear that the supreme court has resolved the duty dichotomy in these types of cases by these two decisions.

The considerations that courts traditionally base their duty determinations on support the resolution. While four of these considerations—relative danger, likelihood of injury, foreseeability, and potential seriousness of injury—do not significantly favor the imposition of a duty for one class of cases *vis-a-vis* the other, the other one does. A municipality's ability to guard against the danger and the cost of guarding against it clearly suggest the imposition of a duty in the pedestrian-defect type of case as compared to the pedestrian-vehicle type of case. This suggestion is supported by both elements of this consideration; it would be extremely difficult for a city to protect all pedestrians from injury from vehicles in all situations. Obviously, cities provide crosswalks and even overpasses and underpasses in certain highly travelled areas, but this is a far

cry from imposing a duty of protection from vehicles in *all* areas of the city. In addition, the cost of providing such all-inclusive protection would outweigh the potential benefits.

On the other hand, the cities regularly maintain all streets for vehicular traffic, and the duty to maintain them in *"reasonably* safe condition" for pedestrians is possible, and the cost would not be prohibitive. Therefore, it is not surprising that the supreme court has found no duty in pedestrian-vehicle cases but has found a duty in pedestrian-defect cases, at least where the defect is located near a parked vehicle.

With regard to this last point, we return to the *Gabriel* dissent, which pointed out:

> "[T]he duty question should not be based on whether the plaintiff is getting out of a lawfully parked car, or crossing a street within a crosswalk, or any other exception or limitation that has been utilized to either impose liability or to deny it. The duty of the municipality should be to provide sidewalks and parkways (and streets and alleys) that are in a reasonably safe condition. That was the duty imposed by the common law, and that duty is the same under the Tort Immunity Act. Once that duty is recognized, the question of whether the duty has been breached can be more properly analyzed. While a two- or three-inch difference in heights between sidewalk slabs might be considered a breach of the duty for sidewalks, that same difference might not be a breach if it was between two concrete slabs in the middle of a city street. Would anyone argue, however, that a city would not have a duty to barricade, fence, pave over, or otherwise do something about a 10-foot-wide pit filled with crocodiles, whether that pit was in a sidewalk, on the parkway beside the sidewalk, or in the middle of a street? The city's duty is the same whether it is a sidewalk or a street, 'to maintain *its property* in a reasonably safe condition for the use in the exercise of ordinary care of people.' (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 85, par. 3—102(a).) Neither the common law nor the Tort Immunity Act distinguishes between types of *property*; some courts have done so since the passage of the Act, and in my judgment, they are mistaken." (Emphasis in original.) *Gabriel v. City of Edwardsville* (1992), 237 Ill. App. 3d 649, 662, 604 N.E.2d 565, 573-74 (Chapman, J., dissenting).

■ We conclude that the supreme court's recent cases, *Marshall v. City of Centralia* (1991), 143 Ill. 2d 1, 570 N.E.2d 315, and particularly *Wojdyla* and *Curatola*, have resolved the differences in treatment between plaintiffs injured in pedestrian-vehicle and pedestrian-defect accidents, and that these cases have recognized a

duty of reasonable care in pedestrian-defect cases. We are obviously aware of the recent fifth district case of *Gabriel*, which relied upon the supreme court's decision in *Wojdyla*. However, in light of the supreme court's subsequent decision in *Curatola*, we conclude that *Gabriel* should not be followed. Therefore, we reverse the trial court's finding and remand for further proceedings consistent with this opinion.

Reversed and remanded.

MAAG, J., concurs.

JUSTICE WELCH, dissenting:
I respectfully dissent. While Justice Chapman gives a very poetic argument, it certainly has a chilling effect on local government that must now anticipate and insure against pedestrians walking upon any portion of the roadways of municipalities.

Our supreme court in *Curatola v. Village of Niles* (1993), 154 Ill. 2d 201, 608 N.E.2d 882, imposed a duty upon the municipality to maintain the streets for persons exiting and entering lawfully parked vehicles. I do not believe they extended that duty to every portion of municipalities' streets. The majority is trying to make new law, a result of which would force municipalities to have to construct roads to sidewalk specifications.